Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. This is Judge William Pryor. We are here this afternoon to hear oral argument in the case of Ledford v. Warden. Who do we have to present argument on behalf of Mr. Ledford today? Good morning, or good afternoon, Your Honor. Jeffrey Erdl on behalf of Michael Ledford. Mr. Erdl, you may begin. Thank you, Your Honor. May it please the court. I'd like to today start with the first issue being the JEB v. Alabama issue. I'd also then follow it up with discussing the ineffective assistance counsel in time permitting. We'll briefly touch on what we call the Germans' conduct claim. Judge, the first thing is trial counsel raised an objection to the state's use of peremptory challenges to eliminate women and said a JEB v. Alabama. This court must give, examine this through the lens of the effective anti-terrorism and effective death penalty act and says that, which says that this court must determine whether the state court's determination was contrary to or on a reasonable application of clearly established Supreme Court precedent or, and relevant to this case, it resulted in a decision based on an unreasonable determination of the facts and likely evidence. The Georgia Supreme Court's resolution of this issue satisfies all three. First of all, it's our position that the Georgia Supreme Court added a burden to the analysis when it required something additional than a pattern of strikes because our position is that Batson has, and his progeny, which JEB v. Alabama is obviously, says that a pattern of strike can give rise to a prima facie case of discrimination and we believe the evidence will show that a pattern of strikes did just that. So, Mr. Arnold, this is Judge Newsom. Let me just maybe kick us off here a little bit. How do you deal though with the existing precedent in this that, if not precisely the statistics, if not precisely on point, are what I'll call pretty doggone close, which it seems like, given your burden under AEDPA, has got to be good enough. Well, how are these cases so, how is this case so demonstrably distinguishable, so much worse than those? And in CAMPA, of course, we actually, you know, turned around the decision below. So, how could this be an unreasonable application of, in light of Hill and CAMPA? Well, first, I think that the district court and the state have misapprehended what Hill has said, and Hill, for example, there was a veneer of 54 potential jurors, 22 of which were African-American, were black. It was a bashing claim. The government used 9 of its strikes, 9 of 14 strikes, to remove 41% of the potential black jurors. Ultimately, the jury consisted of 50% African-Americans. Hill did not say that statistics alone can never support a prima facie case. Hill said that these statistics, and those statistics, according to Hill, without more, do not make out a prima facie case. I don't know if precedents say that the trial court has to consider the totality of the circumstances to determine whether there's a pattern that creates an inference of discrimination, right? If it's a number of factors that have to be considered, I don't understand how what the Georgia Supreme Court said about that is inconsistent with what we have said. Well, I think what this court has said in Ochoa-Vasquez is statistical evidence may support an inference of discrimination, but only when it's placed in context. And the court said, for example, the number of persons struck... So the statistical disparity wouldn't do it alone. You'd have to consider it in context. You'd have to consider a number of factors. Isn't that consistent with what the Georgia Supreme Court said? Right, but the statistics... Well, they had... Ochoa says things like, only when couples of their revision, such as the composition of the one hour and the race of the other struck. All of that evidence was before the Georgia Supreme Court and the trial court. And they then said, no, you still have to have more, more evidence besides the pattern in context. And that, I think, is contrary to Batson and contrary to this court's precedent. But that's not... Counsel, this is Lisa Branch. That's not what the Georgia Supreme Court said. It looked at the strikes and the number of strikes, and then it just said... And then we find that there's nothing else, that Ledford failed to present any additional facts. How is that statement that without the statistical evidence and without anything more, how is that supporting what you're saying the Georgia Supreme Court had said? Well, the Georgia Supreme Court said that statistics in context is not enough. That's the way I read the Georgia Supreme Court's decision. Because they had, before it, the statistics in context. They had the makeup of the veneer. They had the other peoples that were struck by... Well, let's say we disagree with you that that's what the Georgia Supreme Court said, right? Let's say that we understand them to be saying that you have to look at the picture, which is what we've said as well. And when you look at that, you've got a venari here that's 36 persons, 15 women, 21 men. The state exercises nine of its strikes to remove women, but it also accepted six women. Ledford struck four women. How do we... When we look at the circumstances, how would we say that the decision of the Georgia Supreme Court was an unreasonable application of something clearly established by the Supreme Court? Well, if you take Batson itself, and Batson was meant to be a sort of a permissive standard, because swaying was much too difficult to master. And we're talking about strictly, and that all we have to do is raise an inference of discrimination. And that paradigm of strikes in context raises an inference, and it's clearly... It's an unreasonable application of Batson and his progeny. It's an unreasonable determination of the facts in light of the Supreme Court D2. Using 75% of your strikes, three quarters of your party strikes to eliminate approximately two-thirds of the potential women jurors raises an inference that there's something is amiss. And therefore, Batson and his Johnson, the court in Johnson, California v. Johnson or persuasion at this point, and we've put forth that evidence. And finding that there's no prima facie case is clearly an unreasonable application and clearly an unreasonable determination of the facts in light of the evidence before the state courts. But counsel, you acknowledge that the presence of women on this jury does, under our precedent, undercut any gender-based percentage challenges, if you look at our case in U.S. v. Allison and U.S. v. Puente. Right. But this court's precedent really is not material to state court determinations. I'm going to disagree with you on that point. It is true that we have to measure how the Supreme Court of Georgia decides this issue against the Supreme Court precedent. But it would seem to me we've said many times that to the extent that what the Georgia Supreme Court says is consistent with our own precedent, our own understanding of the Supreme Court precedent, we would be hard-pressed to say that what the Georgia Supreme Court held was an unreasonable application of clearly established Supreme Court precedent. If they view it the same way we do, how are we going to say that's unreasonable? Well, I think what we look at, I think this court, given these facts, would find that a prima facie case was made. Because I believe we have... That brings us back to Judge Newsom's questions about, for example, Hill or Campo, the government used 78 percent of its strikes against black drawers, nine out of 11. And we reversed a decision that the defendant had established a prima facie case based on that fact alone. I'm sorry, Judge. I was looking at Campo, and it looked like they only struck seven. They challenged only seven. Maybe they only challenged seven of the strikes, but I could not tell in looking at Campo. This is Judge Newsom. In Campo, my notes show that in Campo, the government was allotted 11, used nine, and seven of those nine were used against African Americans. Right. So 78 percent of those used, or 64 percent of those allotted. In either case, I just can't imagine that you are so far outside Hill and Campo that this should be deemed an unreasonable application of the underlying principles that birthed Hill and Campo. I think our position is, I understand, our position is that when you use three-quarters of your strikes to eliminate two-thirds of the potential African or women jurors, that raises an inference. Again, it's a low bar. It raises an inference of discrimination that should allow the court then to try and ferret out if in fact it was. We admit we cannot carry the burden of showing discrimination at the first stage. The first prong, that's not a state we're meant to try and show the ultimate issue. So our position is it's unreasonable because it does not allow the court to get to step two and then ultimately to step three in what Batson was meant to be, give people or give the court the opportunity to try and ferret out discrimination and what would normally be a process that is ripe for discrimination. I think the Supreme Court has said. Can I just ask you a quick question to kind of tease out the limits of this a little bit? So nine of 12 or 75% to exclude 66% you say too much. What if this had been eight of 12, same exclusion of the same portion of the venery or I don't know, we get down to seven of 12. So sliding scalish to me. I just don't really understand where the principle leaves off. Well, I'm not asking for a bright line rule. I'm saying that in this case, that this pattern of strikes in context gives rise to an inference and a finding that there was no inference of discrimination is contrary to Batson and its progeny. And it's an unreasonable determination of fact unless the evidence presented should this court say that, and I determination is a fact based. It's a fact finding. And the judge, I would point out that, you know, there are a litany of cases saying that just one strike alone is enough to one strike exercise for discriminatory reasons is enough to violate the constitution. And that's the standard that that looking at that, that's the prism that this court has to look through. Don't we have to look at the alternates? Our precedents have looked at alternates. I think you do if you find that it's that you're not bound by the ADPA. I think pinholster says you have to look at the the claim the way the state courts looked at it. So I think in either case, we satisfy the burden. But I think at this point, if you look at the alternates, we have a binary of 43, right? With 18 being women, the state accepts all three female alternates. So it ends up accepting nine of the eight of the 18 women or 50% of the women and use 69% of its strikes against women, which brings us basically in the same position as Tampa and Hill. Judge, I think there's another fact in there that you know, that the court needs to take into account the state tried to use another strike against women, a woman and was prevented because of the the way that the court conducted the wadir here. So I think you're looking at you're now looking at that's because it had already used its alternate for increased strike on a man though, right? Correct. That's correct. And they said they I don't know. I don't know. Well, they tried to use it. And they were told not to but but but but they first did it for a man. And that prevented them from doing it. But they weren't able they were not able to because they had already used that strike for a man. Correct. And they but the the idea is they would have they thought they had another strike and they were going to strike another woman and they couldn't. So you have you have their like I said, nine of 1370% to remove the line is what they wanted to do but couldn't. Well, I think that's I think when you talk about looking at all of the circumstances, that's one of the circumstances. What matters is what actually happened. Not what they could have done if they could have under a different scenario. What really matters in establishing the the pattern for a prima facie case is what actually counted as a strike. No, I think according to I mean, that's like you said, what about letting clearly established Supreme Court precedent tells us that that's not right. Well, I think the the in Batson, Batson clearly says that a pattern of strikes is sufficient, but it didn't say a pattern of strikes and of hypothetical strikes, not that but what they would have done if they could have. Now that this that considering what they wanted to do is just like considering what type of questions they asked of the jurors, which is one of the things that this court in a choice is that's the to put in context, you put it in context, they were trying to strike even more women from the jury. And that's just part of all of the circumstances that we're going to start including them. I mean, that that, you know, that's like saying, but if, you know, then they get to come forward and say, Well, but if we had had one extra peremptory strike, we would have struck a man. I mean, that's so speculative. I don't know how it could possibly be considered. I think it's considered under all of the circumstances, like the, you said earlier, it's like, we must give the court has to consider all of the strike, the people, the race of the people struck the context. This is context. Okay. Do you want to do you have really anything more for us about the I will point out. Yes, I will point out that I think that this court in Campo actually did consider what the hypothetical said, you know, that they did not attempt to exclude all the black jurors as many blacks as it could from the jury. That's speculation to I mean, it's stating a fact about the record and drawing an inference from it. If there are no further questions, I will move on to the ineffective assistance counsel claim. Of course, well aware standard here is again governed by the EPA and the clearly established Supreme Court precedent is Strickland. And in order to prevail, we must show that two prongs and both of them are mandatory, that the council performed efficiently. And secondly, that the performance is to be evaluated by prevailing professional norms. And then prejudice in a state like Georgia is there's a reasonable probability that at least one juror would have struck a different balance here. Trial counsel had the opportunity to prevent the jury from hearing any evidence about antisocial personality disorder or psychopathy. Um, you know, the thing I wonder about when I look at this case is you had a very experienced defense team, a team that has had success in defending death penalty cases. And they get a bad case. It looks like to me, I mean, innocence is not a viable theory of defense, it seems to me, nor if your concern is avoiding a death sentence, there's an argument that, you know, this is really not a heinous enough crime to merit the death sentence. That doesn't look like a winner. And they explore mental health mitigation to try to explain why it is that this defendant might have done what he did in a way that would, you know, reduce the notion that he was morally culpable, blameworthy. And, you know, they're kind of stuck with it. It may not be the greatest offense, but it may be the least bad option available to them. Well, Judge, I think, first of all, this court's decisions and the training that they had, you know, have told them that this type of antisocial personality disorder evidence and psychopathy evidence is extremely aggravating. This court in weeks... It can hurt you, there's no doubt. We've said the fact that you don't present it, it can be a reasonable decision. But we've also... Morton, I know you don't like Morton. You might be surprised that I think Morton's right. But, yeah, I thought he did not. I'm not going to argue with that. I think Morton's different because Morton didn't have the opportunity to foreclose the interruption. They had to get out in front of stuff that the state had the right to bring in here. They could have prevented that. It very clearly says that it's not a per se deficient performance to present this kind of evidence. I'm not asking for a per se rule, and I agree with you. I don't think the court could do it under Eddings and those cases. I don't think the court could say you can't present this. But I think with the... Given this one, and as bad as this case was for them, why was it not only unreasonable for the defense counsel to make this choice, but either contrary to our unreasonable application of Strickland to make that choice? Because it is so bad, and there are... And given the facts of this case, when they had... Prepared to what? What would you have had to do? They had compelling... And they introduced compelling evidence in mitigation that was completely negated and essentially erased by then introducing antisocial personality disorder and psychopathy. They had evidence that would invoke sympathy from a jury. They had... And the Supreme Court has recognized in Porter, Williams, that mitigating evidence that humanizes the defendant creates a reasonable probability of a different outcome. Yet, they had that. They had all sorts of evidence like that. Well, it clearly had a bad childhood, right? Horrible, horrible childhood. Horrible childhood. Had a fault. But they could reasonably also understand that a lot of people, a lot of Georgians, maybe even members of the jury or people who are familiar to members of the jury, have bad childhoods, have bad events in their life, and don't do this kind of crime. And the mental health evidence helps complete the picture. I will disagree with... There's no... I don't think a trial attorney should complete the he is irredeemable, that he is not human, and that is a monster. We use psychopaths to describe the worst criminals and the worst people we know, Adolf Hitler, Charles Manson. But counsel, they were able to, in their presentation of the mental health evidence, they were also able to get in some of the medical testimony that he had suffered a brain injury in the fall from a tree at a young age. And while there was certainly disagreement, evidence brought up by the state that disagreed with that, it was one piece of the mental health puzzle to explain why such a heinous crime, why he had committed such a heinous crime. And aren't you, in saying that they shouldn't have presented it, aren't you engaging in exactly the kind of strategic choice analysis that Strickland is going to stop us from doing? No, Strickland says that even strategic choices can be unreasonable. It might be a rare case. Pardon? You have two minutes. And I think Buck v. Davis is the perfect example of it. The trial attorney made a strategic decision to present the mental health evidence that presented very aggravating circumstances, and the Supreme Court said that was ineffective. They shouldn't have done that. It's the same thing here. There's very little difference between what happened in Buck that proved he's a future danger than introducing here the psychopath. And I point out that it's one thing for the state to argue it, but the defense argued it. And the prejudice from it is patent when you look at some of the things, the way that the defense attorney described Ledford at trial. He does things without considering the consequences, without being where the harm is conflicting, and without having empathy for other individuals. And that's the trial attorney, his defense attorney. And they talk about, he's thinking in terms of, this is I want, and I'm going to get it, and if I don't get it, you're in trouble. That's the defense attorney describing his client. Because he didn't have, by introducing that evidence, he had to, he was sort of locked into that. He could have presented a very compelling evidence, a case in mitigation, without that. If you take that out, the entire sentencing picture is changed and different and much more compelling, and there's a reasonable probability that at least one of the jurors would have sentenced him to, or would have opted for something less than death. This is Judge Newsom. Can I ask you very, very briefly a procedural question about your juror misconduct claim? Sure. So it looks to me from reading the record that the only theory of cause that you presented to the district court was that counsel was ineffective for failing to probe the issue. And now, before us, you seem to be riding a different horse. You seem to be saying that under Williams versus Taylor, there was no indication that would have given your client, or counsel presumably, reason to probe it. And so my question is, especially given the fact that those two theories seem to me to be very nearly mutually exclusive of one another, why is it that you in this court? Well, I think we probably pledged the alternative, but I think when we discovered the communication, we asked, and this was in post-conviction, and I use the we collectively, we asked to subpoena the jurors, and we were denied. And that's the Williams versus Taylor aspect of it. Well, I'm making a misunderstanding. I'm saying that when you got to the federal district court, the only theory of cause to excuse your state procedural default that you argued was ineffective assistance. And I agree with you that ineffective assistance can, in certain circumstances, constitute cause. But that's not really the argument you're making before us. Instead, you're making before us a Williams versus Taylor argument for cause. And I'm just saying, do you think you can fairly change horses between the district court and here? Why haven't you forfeited the Williams versus Taylor argument here by not bringing it in the district court? I think we raised in the district court that we were not allowed to call the jurors at the hearing, and therefore, we did not fail to develop the record in state post-conviction. I think you have to, and I think that's why... Well, that's different from a we had no reason argument. Yeah, I thought your cause argument now, at least your principle cause argument now is, the reason that we didn't probe is because who could have known? Just like a Williams versus Taylor, no one could have thought about probing this juror's supposed lies. Now, I think that's in some tension with your ineffective assistance argument for cause, which is so obvious that even the attorney... I'm sorry? I'm sorry. That would be an understatement. Tension. I mean, Williams versus Taylor gives us cause to excuse the procedural default on direct appeal. I think we were using Williams versus Taylor to show why we hadn't failed to develop the record, not that, and that's why we should have gotten an evidentiary hearing. I think we are still... Just so I'm clear, your sole argument for... Your sole cause argument to excuse the procedural default is ineffective assistance of counsel. Yes, I believe that's my... Yes, I think it is. Okay. That's helpful. You saved your time for rebuttal. Unless, Judge Newsom, do you have a... No, no, no. That's helpful. Thank you so much. Yeah. Let's hear it from the state. Thank you, Your Honor. This is Clint Malcolm on behalf of the appellee. May it please the court. I guess I'll go back and start with the jury selection claim, the JEB claim. Just to counter the argument from appellant in regards to the Georgia Supreme Court's application of clearly established federal law. If you look at the Georgia Supreme Court's decision, it clearly lays out the relevant and applicable prima facie standard that Batson and JEB require for these types of jury selection challenges. So any notion that the trial court or the Georgia Supreme Court somehow shifted the burden and made it more burdensome on the defendant to make a prima facie showing is simply not supported in the record. Moving to their other argument in regards to an unreasonable application of clearly established federal law, I think it's important to remember that the only thing that counsel put forth to the trial court to support their claim that the state was striking women disproportionately was the percentage, 75% of the peremptory strikes. Now that's excluding the alternates, but that was the number that was presented to the trial court. The trial court looked at that number. The trial court also referenced the fact that the state did not challenge six women prospective jurors and that unchallenged female jurors did in fact end up serving on the jury. I think it also, I know the appellant has spent a good time and portion of his brief talking about the CAMFA decisions and the Ochoa-Vasquez decisions and your honors have asked about those numbers. I'm not going to rehash the numbers. I think it's pretty clear from the state court record what the numbers were. The 36 venere was the number in the panel, 15 were female, 21 were male. That's a approximate 42% to 58% breakdown. There's just absolutely no Supreme Court precedent that shows the Georgia Supreme Court somehow misapplied or unreasonably applied the prima facie test that it was required to perform in this case. There really was no development of the claim at the jury selection stage. It was 75%. Here's the number, your honor. The court considered it, looked at the strike list, and there really wasn't any other argument offered on direct appeal to the Georgia Supreme Court. Those were the basic numbers. I would also like to point out that I believe appellant conceived in his brief as well that there were no issues in regards to specific questioning of any of the female jurors or lack thereof of questioning that appellant can point to strengthen any sort of prima facie showing that there was an inference of discriminatory intent on behalf of the state to strike female jurors. Normally that's a factor I think that would come into play but it simply wasn't there as noted by appellant. If there are no other questions on the jury selection claim, I will move on to the ineffective assistance of counsel. As this court is aware, Strickland has said and of course this court has said that decisions made by attorneys, strategic decisions after a thorough investigation, which is certainly what you had here by very experienced death penalty attorneys, are virtually unchallengeable. When you couple that with the deference afforded to a state court decision under the AEDPA, that burden becomes even harder to overcome. This case simply is one of those rare cases that meets that burden. If you look at the decision that trial counsel was faced with, it was a simple one. They could either present this mental health component to their mitigation case, which they ultimately decided to do, which was the most strategic and reasonable decision they could make, or they could abandon it completely. That would mean they would present none of their mental health experts and they would be left presenting family members and a mitigation specialist. That would have been the alternative they would have faced if they decided we're not presenting any of this mental health evidence. They certainly understood the dangers that it posed that the state was going to rebuttal and they were going to talk about things that were harmful to their mitigation case. So in turn, what they did to try to mitigate that blow was to bring it up themselves in their presentation to the jury. I think that's the epitome of reasonable attorney performance. If the state or the other side has something they're going to hit you with and you think it's going to be damaging, sometimes it's better to bring that out and try to address that the best you can in your presentation. That's what Mr. Berry and Mr. West, trial counsel in this case, did. They presented a very thorough mitigation case. I think 15 witnesses were presented, multiple family members, numerous mental health experts who all tried to present the general mitigation case, which was petitioner's horrible upbringing, all the things associated with his childhood, coupled with this fall from a tree and an MRI that showed, they argued, showed brain damage, things of that nature, to try to at least explain to the jury how petitioner or appellant got to the place where he committed this horrible murder. So, I certainly don't think when you apply Strickland in the context of the AEDPA in a case like this, there are no grounds for relief. The antisocial personality disorder, this court has never said that it is per se aggravating, and it's certainly never said that if an attorney thinks that that should be part of their mitigation case or they should bring it out, like in Morton, because they knew it was coming out and they needed to deal with it, they thought directly that that's somehow unreasonable, especially when you have the level of investigation that these attorneys put forth in this case. Of course, that's just a deficiency prong. The prejudice prong in this case, I think, presents a very big challenge for appellant. The aggravating nature of the crime itself was not going to change no matter what trial counsel said or argued or what witnesses they presented. The criminal history of this appellant and the similar transactions were not going to change no matter what mitigation defense they presented. So, it's a stretch for me to see any way where simply putting forth family members in a mitigation investigator, which is essentially what appellant's saying that trial counsel should have done, would have turned the tides and established prejudice under Strickland. There's simply no justification for that. If there are no questions in regards to the ineffectiveness claim, I would briefly touch on the juror misconduct claim since Judge Newsom brought it up. Our response, if appellant is saying that the only argument for cause they're making currently is that counsel were ineffective for not presenting the argument at the motion for new trial and on direct appeal, we would counter that with that. That ineffectiveness claim is in itself unexhausted and therefore not a valid basis to overcome the procedural default of their misconduct claim. So, if there are no further questions from the court, I would simply ask that the court affirm the district court's denial of federal habeas corpus relief as I believe the jury selection claim as adjudicated by the Georgia Supreme Court and the ineffective assistance of counsel claim as adjudicated by the state habeas court were both reasonable applications of clearly established federal law and the juror misconduct claim as found by the state habeas court was procedurally defaulted and appellant has not shown cause and prejudice to extent that the state, the respondent is saying that the only thing that was presented to the trial court on the JEB issue was the percentage of strikes. That's just fundamentally wrong. The defense said, raised that and then the prosecutor himself put on the record all of the strikes against women exercised by each side. Plus, the juror, the judge had the strike list as I believe the counsel for the respondent acknowledged. And that strike list, it's part of the record and we cite to it, shows the race and gender of each juror. So, the court was keenly aware of the context that this court requires. So, the court had all of the relevant evidence before it to make a determination on whether this pattern of strikes when considered with the entire makeup of the liar as well as the race or in this case, the gender of the juror struck was before it. I'd also point out that in this case, there was a Batson challenge based on one African-American juror and the court there went through a full three-step Batson analysis, found that there was a prima facie case and then made the state give race neutral reasons and then decided the ultimate issue. So, I think the court can consider that as in deciding this case. Also, CAMPA, I think is distinguishable because in that case, this court found significant that the prosecution didn't use all of their strikes against, in that case, black jurors. Here, they used all of their strikes and tried to use another. Unless there are any other questions on the JEB claim, I'm going to switch to an effective assistance counsel and I want to point out too that the state, the counsel for the respondent only partially quoted Strickland and he said, I believe he said, strategic choices made after thorough investigations are virtually unchallengeable. There's an important omission there. It really reads, strategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Here, they never explored options. Tom West, who was in charge of the penalty phase, said he never considered not to. The counsel for the respondent also said that justified their actions by, he got out in front of it because he knew the state was going to hit them with this. Well, he could have avoided, they could have avoided being hit at all. They just had to say, we're not going to put forth mental health evidence and I will say it was incredibly weak. A radiologist who's trained to read the MRIs said there's nothing wrong with it. As a matter of fact, reached out when he found out that the defense expert was going to say there was something represented in the MRI, reached out to him to say, you're wrong. Don't be, and then they also knew that the state doctors who also had a look at the MRI said there was nothing there. And what's really important is the fact that the medical records from that fall are devoid of anything indicating there was any kind of brain damage. Never lost consciousness. They did an x-ray of the neck and the head and found there was nothing there. The best that the defense experts could say was a fall like that has got to shake your head a little bit. So they had scant evidence of brain damage. And to rely on that, to then introduce such damning evidence of psychopathy and antisocial personality disorder is unreasonable. This court's precedents show we don't have to complete the pictures as somebody suggested, because there are dozens of cases in this court saying stuff like antisocial personality disorder is harmful and it wasn't ineffective not to present it. So we would ask, we think also one final point, I believe the state courts, the state habeas court and trial counsel, as a matter of fact, were operating under the misconception that mitigation has to explain the crime. Kennard v. Dredge very clearly says mitigation does not have to be tethered to the offense. There was no reason to explain the crime. I don't think there's any argument that they were going to make the jury like Mr. Ledford. They weren't going to be able to explain the crime and they weren't going to be able to get rid of the prior convictions. The only thing they had the option of doing is presenting some evidence that might give the jury reason to exercise mercy. And by failing to do that, in fact, introducing harmful evidence, they rendered in the psychosis counsel. Thank you. Thank you, Mr. Erdo. We have your case and we will be in recess. Thank you.